IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-CR-102 |
| | ) | (MATTICE/SHIRLEY) |
| JERIS COKER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case was before the Court on September 25, 2013, for a suppression hearing on the Defendant's Motion to Suppress and Memorandum in Support [Doc. 13], filed on September 4, 2013. Assistant United States Attorney Kelly A. Norris appeared on behalf of the Government. Assistant Federal Community Defender Jonathan A. Moffatt appeared on behalf of Defendant Coker, who was also present. At the conclusion of the hearing, the Court granted the Defendant's request for leave to file post-hearing briefs. The Defendant filed his post-hearing brief [Doc. 20] on November 15, 2013. The Government filed its responsive post-hearing brief [Doc. 22] on December 6, 2013. The Court took the motions, responses, testimony, exhibits, and post-hearing briefs under advisement on December 6, 2013.

# I.  POSITIONS OF THE PARTIES

The Defendant is charged with one count [Doc. 6] of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  This charge stems from July 31, 2012 traffic stop in which the Defendant's vehicle and person was subsequently searched.

The Defendant argues [Docs. 13, 20] that his Fourth Amendment right to be free of warrantless searches and seizures was violated.  He contends that he was stopped without probable cause to believe that a traffic violation had occurred.  The Defendant also argues that the scope of the traffic stop was impermissibly exceeded when he was detained for an unreasonable length of time until a drug detection dog was brought to the scene of the traffic stop.  In addition, he asserts that he was unconstitutionally subjected to a pat-down as there was no reasonable suspicion to believe that he was armed or dangerous.  As a result of the foregoing, the Defendant maintains that any evidence derived from the illegal search and seizure should be suppressed.[1]

The Government responds [Docs. 15, 22] that the officer had probable cause to conduct a traffic stop because the Defendant had crossed the center line multiple times.  In addition, the Government argues that based on the totality of the circumstances, the officer had reasonable suspicion that criminal activity was afoot in order to continue detaining the Defendant until a drug detection dog arrived.  Finally, the Government maintains that the pat-down was supported by a reasonable belief that the Defendant was armed and dangerous.  Therefore, the Government

---

[1] The Court notes that in the Defendant's initial brief [Doc. 13 at 6], the Defendant also challenged the search of his vehicle on the grounds that that dog sniff, which alerted to the presence of narcotics in the vehicle, was not reliable under the circumstances.  However, during the September 25 hearing, defense counsel withdrew his argument, conceding that the alert was reliable and provided probable cause for the search.  [Doc. 19 at 6-7].  Nonetheless, the Government put on evidence during the hearing concerning the dog's training and certification leading the Court to conclude that the dog was a reliable drug detection dog.

contends that the search and seizure was lawful and any evidence derived during the traffic stop should not be suppressed.

## II.     SUMMARY OF THE EVIDENCE

The Government called two witnesses during the September 25 hearing: Deputy Reginald McCullough of the Blount County Sheriff's Office and Officer Dwight Porter of the Maryville Police Department. The Defendant called one witness, Charles Brown.

### A. Testimony of Deputy Reginald McCullough

Deputy Reginald McCullough testified that he has worked as a patrol deputy for the Blount County Sherriff's Office since 2008. On July 31, 2012, Deputy McCullough was on patrol working the midnight shift in Rockford, Tennessee, and had a ride-along citizen with him during his shift. Deputy McCullough described Rockford as a high crime area due to a number of apartment thefts and drug crimes. At approximately 2:45 a.m., Deputy McCullough effectuated a traffic stop of the Defendant's vehicle. Deputy McCullough testified about the traffic stop using the in-car video recording from his police cruiser [Exhibit 1 to Sept. 25, 2013 hearing]. He explained, however, that the video does not depict everything as clearly as it actually appeared the night of the stop.

Deputy McCullough testified that he stopped the Defendant's vehicle after observing the Defendant drive left of the center line multiple times. Upon initiating the police cruiser's emergency lights, the Defendant did not immediately stop until several seconds later after Deputy McCullough sounded the sirens in order get the Defendant's attention. Deputy

McCullough testified that it was uncommon for a driver to continue driving after he initiated his emergency lights. Once the Defendant came to a stop, Deputy McCullough approached the driver's side door and explained to the Defendant that he had been pulled over for crossing the center line. The Defendant responded to the effect that it was difficult to see with his headlights. Deputy McCullough obtained the Defendant's driver's license, registration, and insurance. The Defendant was asked where he lived because his driver's license and insurance had a Knoxville address. The Defendant explained that he lived just up the road with his girlfriend and had been residing there for the past year. The Defendant also stated that he was returning home from his mother's house in Knoxville.

Deputy McCullough returned to his police cruiser [Ex. 1 at 2:48:28] and began to run the Defendant's driver's license, check for outstanding warrants in Knox and Blount County, and write a traffic citation. Deputy McCullough testified that while he was sitting in his cruiser, he observed the Defendant continually staring back at him. Deputy McCullough described the staring as "a very intense stare. It was constant. He didn't really break away from it at all." [Doc. 19 at 56]. Deputy McCullough also stated that the Defendant was "moving around a lot" in his vehicle. Specifically, the Defendant was observed leaning forward and reaching his right hand towards the back center of his vehicle. Deputy McCullough stated that the Defendant's movements were visible to him because the spotlight from the cruiser was shining on the Defendant's vehicle. Deputy McCullough testified that he was unsure whether the Defendant was looking for something or if he was trying to hide something. Feeling uncomfortable and believing the Defendant's actions were unusual, Deputy McCullough asked the Defendant to place his hands outside the window. Deputy McCullough approached the Defendant's vehicle to

4

question him as to why he was moving around. [Ex. 1 at 2:52:52]. The Defendant explained that he was smoking a Black and Mild cigar. Deputy McCullough testified that based on his training and experience as an officer, Black and Mild cigars are used as drug paraphernalia by emptying the tobacco out and replacing it with marijuana. The Defendant was asked if he had been arrested before and responded that he had been charged with domestic violence as a juvenile. The Defendant was told he could continue smoking but to stop moving around. Deputy McCullough returned to his cruiser to continue writing the citation. [Id. at 2:54:05].

Shortly thereafter, at 2:55:05, Deputy McCullough was informed by dispatch that the Defendant had no outstanding warrants. At this point, Deputy McCullough decided to return to the Defendant's vehicle to investigate further the Defendant's seemingly odd behavior. [Id. at 2:55:31]. Deputy McCullough testified that the combination of the following circumstances were suspicious to him, warranting further questioning: the Defendant acted nervous because he continued to stare and move around, the Defendant was traveling from Knoxville, and the stop occurred during the early morning hours. Deputy McCullough elaborated on these last two factors. Specifically, he explained that people who are found to have drugs on them in Rockford often get their supply from Knoxville and that in his experience, most of the narcotic finds have occurred at nighttime.

When the Defendant was confronted about why he seemed so nervous, the Defendant responded that he did not like the police and that he was concerned that another ticket would result in the suspension of his driver's license. The Defendant was then asked if there was anything in his vehicle that should not be there, such as marijuana. The Defendant replied there was not. Deputy McCullough also asked whether a drug detection dog deployed outside of the

5

Defendant's vehicle would alert on the vehicle. The Defendant stated that the dog "shouldn't," and explained that his vehicle had been searched in the past because he had been around "weed smoke." Deputy McCullough testified that the Defendant's responses raised a red flag in his mind because the Defendant's answers came across as being "very wishy-washy," rather than direct. Deputy McCullough proceeded to ask the Defendant for consent to search his vehicle. The Defendant debated for almost two minutes on whether he wanted to allow Deputy McCullough to search his vehicle before ultimately declining to give consent. Deputy McCullough returned to his cruiser and requested the assistance of a K-9 officer. [Id. at 3:00:02] Deputy McCullough testified that because the K-9 officer with the Blount County Sheriff's Office was on another call, he radioed dispatch to see if the City of Alcoa or Maryville had a K-9 officer available. Deputy McCullough stated that at this point in the traffic stop, he still had not completed writing the citation.

After Deputy McCullough had returned to his cruiser and requested K-9 assistance, the Defendant waved his hands outside the window, signaling that he wanted Deputy McCullough to come back. [Id. at 3:00:16]. Deputy McCullough walked back to the Defendant's vehicle and the Defendant asked whether he would have to wait on another officer to bring a dog. Deputy McCullough explained to the Defendant that they would be waiting on a dog while he finished writing the traffic citation. After Deputy McCullough walked back to his cruiser, the Defendant stuck his hands out the window for a second time to ask another question. Deputy McCullough told the Defendant that he did not have to keep his hands outside the window but to stop moving around.

Deputy McCullough testified that while he sat in his cruiser he continued to observe the

Defendant move around. Because he had already asked the Defendant several times to stop moving, Deputy McCullough testified that he was concerned for his safety and proceeded to remove the Defendant from his vehicle. [Id. at 3:03:58]. Deputy McCullough walked the Defendant over to the front of the police cruiser, where he explained that he was going to pat the Defendant down for weapons. Deputy McCullough testified that prior to the pat-down, he asked if he could empty the Defendant's pockets. The Defendant replied, "Go ahead, sir." A holster was retrieved from the Defendant's right-front pocket. When asked if the Defendant had a gun in his vehicle, the Defendant replied, "no, sir," and explained that the holster was for his cellular phone. Because Deputy McCullough believed that a gun could be in the vehicle, he placed the Defendant in handcuffs. The Defendant was asked whether he had been moving around because there was a gun in his vehicle, and the Defendant again denied the presence of a gun.

Deputy McCullough testified that based on his experience as a police officer, he believed that the holster was for a gun, not a cellular phone. He explained that the shape of the holster and the placement of the holster's clip, which allowed the holster to be worn inside the pocket, were consistent with that of a gun holster. The Government entered Exhibits 2-A and 2-B, photographs of the front and back of the holster.

Deputy McCullough testified that at 3:08 a.m., while standing outside the police cruiser with the Defendant, he continued to work on the citation. Deputy McCullough stated that at 3:11:35 of the in-car video, he could be heard asking the Defendant for his social security number in order to complete the citation. He also stated that at 3:14:12, he could be heard asking the Defendant about his address because it was listed incorrectly on the Defendant's registration and driver's license.

7

Deputy McCullough stated that around 3:19 a.m., K-9 Officer Dwight Porter from the Maryville Police Department arrived on the scene. Deputy McCullough spoke with Officer Porter for several minutes about why he stopped the Defendant and why he believed the Defendant was acting suspiciously. Officer Porter then led his dog in a sniff around the exterior of the Defendant's vehicle which was subsequently searched. The items retrieved from the search included: a gun, a Tupperware container, scales, a red lunchbox, and a box of Glad sandwich bags. Deputy McCullough testified that the gun fit perfectly into the holster that was discovered in the Defendant's pants pocket. A photograph of the gun inside the holster was entered as Exhibit 3.

In regards to the remaining items discovered in the Defendant's vehicle, Deputy McCullough stated that the Tupperware container, scales, and lunch box all contained a leafy substance. Based upon his training and experience, Deputy McCullough believed that the above evidence was indicative of someone who sells drugs. He explained that sandwich bags are typically used to package the drugs while the scales are used to weigh the drugs. In addition, he testified that the odor in the Tupperware box was consistent with the smell of marijuana.

On cross-examination, Deputy McCullough testified that prior to the July 31 traffic stop, he did not know the Defendant and had not received any information about the Defendant's vehicle being involved in drug trafficking. Deputy McCullough testified that he had been driving behind the Defendant's vehicle prior to the start of the video but explained, "I don't know if I was following in a sense of following him, but I was traveling in the same direction as him." [Doc. 19 at 76]. Deputy McCullough testified that the Defendant traveled down Williams Mill Road and took a left on Oak Hill Drive which is where the traffic stop was

8

initiated. Deputy McCullough agreed that William Mill Road was dark and curvy, and that no other cars were on the road except for Deputy McCullough's and the Defendant's. Deputy McCullough could not remember if he had ever previously performed a traffic stop on Oak Hill Drive, nor could he verify the number of calls the Sheriff's Office receives for that particular street.

Deputy McCullough testified that when he stopped the Defendant, the Defendant slowed down and did not take any evasive measures. Deputy McCullough stated that by 2:48:41, he had all the information he had requested from the Defendant and returned to his police cruiser to begin working on the traffic citation. Deputy McCullough acknowledged that when he instructed the Defendant to stick his hands out of the window, the Defendant complied on several occasions. However, Deputy McCullough testified that he grew suspicious of the Defendant throughout the stop because the Defendant acted nervous, was constantly staring, and was moving around in his vehicle.

Deputy McCullough verified that when he approached the Defendant's vehicle the first time to investigate why the Defendant was moving around, he did not have his gun drawn. When asked whether he would draw his gun if he feared a person was armed during a traffic stop, Deputy McCullough stated that it would depend on the situation. He explained that if the person was just moving around, as the Defendant was here, it would not necessarily cause him to draw his gun because he had the Defendant stick his hands outside the window.

The second time Deputy McCullough approached the Defendant's vehicle, Deputy McCullough testified that he had not made a conscious decision to try and search the Defendant's vehicle but decided that he needed to investigate the situation further. At this point

9

in the stop, the ride-along can be seen on the in-car video standing outside of the cruiser and beside the rear passenger side of the Defendant's vehicle. Deputy McCullough denied that having the ride-along stand outside the cruiser was tantamount to Deputy McCullough believing that the Defendant could not have been armed. He explained that having the ride-along outside of the cruiser was actually safer for two reasons: if something were to go wrong, the ride-along would have an escape route as opposed to being a "sitting-duck," and because the Defendant was moving around so much, the ride-along acted as a second pair of eyes to see if there was anything in the Defendant's vehicle while Deputy McCullough spoke with the Defendant. At this point in the stop, however, Deputy McCullough testified that he did not believe the Defendant was armed.

Deputy McCullough next testified about approaching the Defendant's vehicle for a third time in order to ask him out of his vehicle and conduct a pat-down. Deputy McCullough explained that he could see one of the Defendant's hands on the window sill but that the Defendant continued to move around. Deputy McCullough told the Defendant that his behavior was making him uncomfortable and that he was removing the Defendant from the vehicle in order to conduct a pat-down for weapons. The Defendant placed both hands on top of his head, while Deputy McCullough placed one of his own hands on top of the Defendant's hands and used his other hand to tug on the Defendant's shirt in order to get the Defendant to bend his leg and step back. Deputy McCullough testified that although he was touching the Defendant at this point, he had not begun the pat-down. He also stated that while he had his hands on the Defendant, but before the pat-down, he asked permission to empty the Defendant's pants

pockets.  Deputy McCullough described the holster that was retrieved from the Defendant's pocket as a soft, cloth item.

Deputy McCullough reiterated that at 3:11:42, he could be heard on the in-car video asking the Defendant for his social security number.  He agreed that approximately three minutes later, he could be heard explaining to the Defendant that he had ten days to change his address on his driver's license and 30 days to change the address on his registration.  Deputy McCullough testified that he was still filling out the citation at that point.  The traffic citation from the stop was entered into evidence as Exhibit 6.  Deputy McCullough testified that 3:10 was listed on the traffic citation as the time the citation was completed.

On redirect examination, Deputy McCullough testified why he considered the area of the stop a high-crime area despite not being able to specifically recall responding to calls on Oak Hill Drive.  He stated that his "experience in working with the sheriff's office, from responding to calls in that area, recovering drugs from vehicles from that area, and various other crimes within the Rockford area" led him to believe he had stopped the Defendant in a high-crime area. [Doc. 19 at 99].

In regards to the Defendant moving around, Deputy McCullough testified that the Defendant's head was always visible and appeared above the headrest even when he was moving.  Deputy McCullough reiterated that the movement was what caused him to become nervous that the Defendant was either looking for a weapon or trying to hide a weapon or drugs, and that for this very reason, the pat-down was conducted for safety.  Deputy McCullough explained that it is uncommon for people to continue moving as the Defendant did during a traffic stop after being asked to stop.

Deputy McCullough also stated that although the holster was soft, the clip on it was hard. He stated that the clip would have been on the outside of the pocket because that is how the holster is made to be worn.

On recross-examination, Deputy McCullough testified that the clip of the holster was plastic. He also reiterated that he was in Rockford when he pulled the Defendant over but could not remember if he had done any police work on Oak Hill Drive, that "the pat-down was strictly for weapons," [Doc. 19 at 102], and that the Defendant's constant moving and staring was the primary reason he asked the Defendant to get out of his vehicle.

### B. Testimony of Officer Dwight William Porter, II

Officer Dwight Porter testified that he has been employed with the Maryville Police Department since 2006 and currently serves as a K-9 officer. Since 2007, Officer Porter has been assigned to K-9 Bolo. Bolo's certifications from 2007 through 2012 from the North American Police Work Dog Association and other K-9 certification classes were entered by the Government as Exhibit 4.

Officer Porter testified about the cooperative efforts that exist between the Blount County Sheriff's Office and the police departments of the cities of Maryville and Alcoa. He explained that the departments have a mutual-aid agreement in which, if one of the departments is in need of assistance, such as SWAT team or K-9 assistance, one of the other departments will provide the requested aid.

Officer Porter stated that he was on duty the night of July 31, 2012, when he received a call on the radio from dispatch asking if he could assist Deputy McCullough at a traffic stop.

12

Officer Porter immediately began driving towards the stop but got lost on his way there. Once he realized he was lost, he called the Blount County Communication Center which directed him to the location of the stop and remained on the phone with him until he reached the scene. Officer Porter explained that because the stop was outside of his jurisdiction, he was not familiar with the streets. As a result, he believed that he was delayed arriving to the scene about five to ten minutes.

Upon arriving at the scene, Officer Porter spoke with Deputy McCullough regarding the details of the stop. Officer Porter then identified himself to the Defendant as a police officer with the Maryville Police Department and asked the Defendant for consent to conduct a dog sniff around the exterior of the Defendant's vehicle. Although the Defendant declined to give consent, a dog sniff was nonetheless conducted. Bolo subsequently alerted on the vehicle and Officer Porter conducted a search. A gun was retrieved from underneath the backseat. Officer Porter stated that he remembered the backseat was ajar and the seat cushion was loose where the gun was found.

On cross-examination, Officer Porter testified that when he received the call to assist Deputy McCullough he could not recall the location he was patrolling. He explained that the Maryville Police Department has different zones within the city and that on any given night he could be assigned to patrol a different zone. Officer Porter could not recall whether he was patrolling the west side of town on the night in question, or the east side, which would have placed him closer to the location of the traffic stop. Officer Porter related that while he was on the phone with the Blount County Communication Center getting directions, he had gotten lost a second time because he had passed the road on which the Defendant was stopped.

13

On redirect examination, Officer Porter testified that he was currently the only K-9 officer for the Maryville Police Department.

## C.  Charles Brown

 Charles Brown testified that he works for the Federal Defender's Office as an investigator.  He conducted a field investigation for this case by visiting the location of the stop and taking photographs of the scene as well as the immediate area.  Mr. Brown described the area around Oak Hill Drive as a rural area with nice homes and open fields and meadows.  A collection of photographs depicting Oak Hill Drive and the surrounding area were entered into evidence as Exhibit 7.

The photographs depicted the road on which the Defendant was driving immediately before being stopped, as well as several of the homes that lined Oak Hill Drive.  Mr. Brown testified that there were three or four houses on Oak Hill Drive and that one of the homes was enclosed by a wrought iron fence.  Mr. Brown opined that wrought iron fences were expensive. One of the driveways and houses photographed belongs to the Defendant's girlfriend and her mother.  Mr. Brown testified that while he was at the scene, he never saw shell casings on the street or police tape around the area.

On cross-examination, Mr. Brown testified that he was unsure whether any of the homes photographed were owned or rented.  He also testified that he was unaware of any crime that occurred in the area but acknowledged that criminal activity can occur even at homes with wrought iron fences.  Mr. Brown stated that he knew there was a trailer park nearby but was not aware of any run-down houses in the area.   He agreed that trailer parks and run-down homes are

14

usually seen in high-crime areas. Mr. Brown testified that although he had no personal knowledge of whether Oak Hill Drive was in a high-crime area, based upon his experience, he had never heard of that particular area being considered a high-crime area and stated that what he saw during his field investigation was not typical of a high-crime area.

On redirect examination, Mr. Brown testified that he had spoken with the mother of the Defendant's girlfriend who lives on Oak Hill Drive and related that the police are never called out to her street.

## III.    FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented:

On July 31, 2012, while on patrol, Deputy McCullough observed the Defendant driving left of the center line several times around the William Mill Road and Oak Hill Drive area of Rockford, Tennessee. Deputy McCullough effectuated a stop of the Defendant's vehicle at approximately 2:45 a.m. After informing the Defendant that he had been pulled over for crossing the center line, the Defendant handed his driver's license, registration, and insurance to Deputy McCullough. Deputy McCullough returned to his cruiser at 2:48:28 to begin writing a traffic citation and check for outstanding warrants.

While in his cruiser, Deputy McCullough observed the Defendant staring back at him using the driver's side mirror. The Defendant was also observed moving around, including leaning forward and reaching into the backseat. At 2:52:52, Deputy McCullough approached the Defendant's vehicle and asked the Defendant why he was moving around so much. The Defendant denied moving around and explained that he was smoking a Black and Mild cigar.

Deputy McCullough told the Defendant he could continue smoking but not to move around. Deputy McCullough returned to his cruiser at 2:54:10 to continue writing the citation.

Dispatch cleared the Defendant of outstanding warrants at 2:54:48. Because the Defendant appeared nervous due to his continually staring and moving around, combined with the fact that the Defendant was stopped in a high-crime area after traveling back from Knoxville in the early morning hours, Deputy McCullough became suspicious and decided to return to the Defendant's vehicle for a second time at 2:55:31 to investigate the situation further. In response to Deputy McCullough's questioning, the Defendant denied the presence of narcotics in his vehicle and stated that a drug detection dog "shouldn't" alert but that his vehicle had been searched in the past because he had been around "weed smoke." Deputy McCullough asked for consent to search the Defendant's vehicle and after several minutes of debating, the Defendant declined to give consent. Deputy McCullough returned to his cruiser at 3:00:02 and called the dispatcher to send a K-9 officer to the stop.

Almost immediately after Deputy McCullough had returned to his cruiser, the Defendant waved his hands outside his window, signaling for Deputy McCullough to come back. When Deputy McCullough returned, the Defendant inquired whether a K-9 was already at the scene or whether he would have to wait for another officer to arrive. Deputy McCullough explained that they would have to wait a few minutes for another officer to bring a dog and that in the meantime, he would continue working on the citation.

Deputy McCullough returned to his cruiser at 3:01:40 and continued working on the citation. The Defendant was observed staring back at Deputy McCullough and moving around in his vehicle. Deputy McCullough testified that at this point, he became increasingly

uncomfortable and feared for his safety. At 3:03:58, Deputy McCullough removed the Defendant from his vehicle and proceeded to conduct a pat-down of the Defendant. Deputy McCullough told the Defendant that his behavior had made him uncomfortable and that he was going to do a pat-down for weapons. While Deputy McCullough's hands were on the Defendant, but prior to the pat-down, the Defendant consented to Deputy McCullough emptying the Defendant's pants pockets. Deputy McCullough pulled out a holster from the Defendant's right pants pocket. The Defendant explained that it was a holster for his cellular phone and that he did not have a gun in his vehicle. Deputy McCullough continued writing the citation while he waited for a K-9 officer to arrive. The citation was completed around 3:10 a.m.

Officer Porter arrived on the scene with Bolo at approximately 3:19 a.m. Officer Porter asked the Defendant for consent to conduct a dog sniff of the vehicle but the Defendant declined to give consent. Officer Porter, however, walked Bolo around the exterior of the Defendant's vehicle and Bolo alerted on the vehicle. Office Porter searched the vehicle and retrieved a gun from the underneath the backseat. He recalled the backseat cushion was loose.

## IV. ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A search conducted without a warrant is unreasonable "subject only to a few specifically established and well-delineated exceptions." Clemente v. Vaslo, 679 F.3d 492, 489 (6th Cir. 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). The present matter involves the "well-delineated" automobile exception. United States v. Smith, 510 F.3d 641 (6th Cir. 2007). In addition, an officer may stop and briefly detain a person for investigative

17

purposes, when that officer has "reasonable suspicion" based on articulable facts, that "criminal activity [is] afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). Absent probable cause, only brief detention is permitted.

In his initial and post-hearing briefs [Docs. 13, 20], the Defendant argues that briefly crossing the center line one time while traveling on a dark and curvy road did not provide probable cause to suspect that a traffic violation had occurred. In addition, the Defendant challenges the length of the stop and the subsequent pat-down for weapons. The Defendant maintains that he supplied the necessary information needed to write a traffic citation, but rather than completing the citation, Deputy McCullough impermissibly questioned the Defendant about the presence of narcotics, which in turn unreasonably prolonged the stop for an additional 36-39 minutes. The Defendant argues that nothing out of the ordinary occurred during the stop that justified the continued detention of the Defendant from the time that the citation *should* have been completed up until the K-9 officer arrived. Thus, the Defendant argues that there was not only a lack of reasonable suspicion to detain him until the drug detection dog arrived, but that there was also no reasonable grounds for believing that the Defendant was armed and dangerous such that a pat-down for weapons was justified.

The Government responds [Docs. 15, 22] that the Defendant drove left of the center line multiple times, thereby providing probable cause to effectuate a traffic stop. The Government also maintains that reasonable suspicion supported the detention of the Defendant until the K-9 officer arrived as well as the pat-down for weapons. The Government argues that Deputy McCullough could not have completed the traffic citation any sooner than he did because he was continually interrupted by the Defendant's willful failure to stop moving around after being

18

instructed to stop.  The Government further submits that the length of time the Defendant was detained was not unreasonable because Deputy McCullough had developed reasonable suspicion during the traffic stop due to the Defendant's odd behavior and the fact that the Defendant was stopped late at night in a high-crime area.  For these same reasons, the Government asserts that Deputy McCullough was reasonably concerned for his safety and, thus, removing the Defendant from his vehicle to conduct a pat-down for weapons was appropriate under the circumstances.

The Court will first analyze whether the Defendant's vehicle was lawfully stopped.  Next, the Court will consider the propriety of the detention by addressing the scope of the initial stop and whether reasonable suspicion existed justifying the continued detention of the Defendant until the K-9 officer arrived.  Finally, the Court will address the propriety of the pat-down by determining whether the pat-down for weapons was likewise supported by reasonable suspicion.

## A.  Initial Stop

An automobile stop, even for a brief period of time and for a limited purpose, constitutes a "seizure" for Fourth Amendment purposes.  Whren v. United States, 517 U.S. 806, 809 (1996).  However, if an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."  United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994).  Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388.  In other words, whether probable cause exists is "is fact-dependent and will turn on

19

what the officer knew *at the time he made the stop*." Id. at 391 (emphasis in the original). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Moreover, if a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." Ferguson, 8 F.3d at 391.

In the present matter, Deputy McCullough stopped the Defendant for crossing the center line in violation of section 55-8-120 of the Tennessee Code Annotated. [Ex. 6]. The statute provides, in pertinent part, that a vehicle shall at all times be driven at the left side of the roadway "[w]hen approaching the crest of a grade or upon a curve in the highway where the driver's view is obstructed within three hundred feet (300') or such distance as to create a hazard in the event another vehicle might approach from the opposite direction," or "[w]hen approaching within one hundred feet (100') of or traversing any intersection." Tenn. Code Ann. § 55-8-120(a)(1-2). Moreover, the parties appear to contest whether the Defendant also violated section 55-8-123(1) of the Tennessee Code Annotated, which provides that when a road is divided into two or more lanes of traffic, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety."

The Defendant argues that Deputy McCullough's in-car video simply does not support a finding that any traffic violation occurred. The Defendant concedes that the video does reveal at 2:45:44 that the Defendant briefly crossed the center line while navigating around a left hand curve. However, the Defendant relies on various case law in his briefs for the proposition that

momentarily crossing the center line on a dark and winding road does not rise to the level of probable cause to effectuate a traffic stop.

The Government responds that the Defendant's concession at 2:45:44 is evidence that he violated section 55-8-120(a)(2). The Government also asserts that the case law relied on by the Defendant is distinguishable as those cases deal with leaving the lane of travel one time under conditions that made it impracticable to stay within a single lane. In contrast, the Government maintains that the Defendant crossed the center line repeatedly and did so for no apparent reason. In addition, the Government argues that probable cause supports a finding that the Defendant also violated section 55-8-140(2) of the Tennessee Code Annotated.[2]

The Defendant relies on Sixth Circuit and Tennessee case law, in which the courts have found an isolated event of crossing the line or briefly leaving the lane of travel to be an insufficient basis for finding that section 55-8-123(1) had been violated. See United States v. Gross, 550 F.3d 578, 583 (6th Cir. 2008) (observing that "[w]hat Deputy Ritter described is essentially a slow lane change: the vehicle straddled two lanes for a few seconds while changing from one lane to the other, in an area where the highway began a steep incline and changed from two to three lanes. Without some further allegation of erratic or improper driving, this simply is not within the scope of the statute."); United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) (holding that "one isolated incident of a large motor home partially weaving into the

---

[2]The statute provides the following in regards to making a turn at an intersection:

> Left Turns on Two-way Roadways. At any intersection where traffic is permitted to move in both directions on each roadway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and by passing to the right of the center line where it enters the intersection, and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered. Whenever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection.

emergency lane for a few feet and an instant in time" did not create a traffic violation under the statute).

The Defendant also cites to the Court State v. Binette, 33 S.W.3d 215 (Tenn. 2000) as a somewhat factually similar case. In Binette, the court held that whether proper grounds existed to initiate a traffic stop was determined by the totality of the circumstances, not the number of times a vehicle touched the center line or drifted within the lane of travel. Id. at 219. Under the facts of the case, the officer suspected the defendant was driving under the influence of an intoxicant after he observed the defendant cross the center line twice, make a hard swerve, and travel fifteen miles over the speed limit. Id. at 216. Based solely upon the review of the in-car video, as the officer had not testified during the suppression hearing, the court found that the video did not substantiate any of the officer's claims and therefore discredited the officer's statements concerning the defendant's driving. Id. at 219. The court found no pronounced swerving and that any "weaving" that did occur was entirely within the defendant's own lane of travel. Id. In addition, the court observed that the defendant proceeded correctly through a number of intersections and stop lights, maintained appropriate distance behind vehicles, and was traveling on a winding road, which the court acknowledged was a more difficult task than traveling in a straight line. Id. Although the video showed that the defendant occasionally drifted from the center of the lane, the court found that under the totality of the circumstances, the stop was not supported by reasonable suspicion. Id. at 220.

In the present matter, the Court finds the above case law distinguishable for several reasons. First, unlike Binette, Deputy McCullough testified during the suppression hearing regarding his observations and reasons for initiating the traffic stop. For the following reasons,

the Court finds Deputy McCullough's testimony credible. The video reveals that Deputy McCullough drove behind the Defendant for roughly one minute and forty-four seconds before initiating the traffic stop.[3] Deputy McCullough testified that during this time, he observed the Defendant cross the center line multiple times. When Deputy McCullough explained to the Defendant that he "kept driving left of the center," the Defendant did not deny the allegations but made a comment about his headlights. Although the center line is not readily apparent at times due to the dark nature of the in-car video, the Defendant can be seen crossing the center line on at least two occasions at 2:45:12 and 2:45:44. Deputy McCullough testified on direct examination that the video is not as visually clear in comparison to what he was able to see on the night of the traffic stop. Moreover, the Court notes that Deputy McCullough's testimony went unchallenged during the hearing, and no evidence was put on to contradict his version of events. Because Deputy McCullough is in a better position than the Court to recount what transpired while following the Defendant, the Court will not supplant its version of events based upon what the in-car video may or may not show. Accordingly, Deputy McCullough's testimony is found credible.

Secondly, unlike the cases relied on by the Defendant where a brief touching or crossing of the line failed to substantiate a finding of probable cause, the Defendant's act of crossing the center line here was not a brief or isolated event but occurred several times during the brief span of time Deputy McCullough was driving behind the Defendant. In addition, there was no evidence that the weather was poor, that the Defendant was driving a top-heavy vehicle, or any other conditions that made it unrealistic for the Defendant to stay in his lane of travel. In United

---

[3] The Court notes that Deputy McCullough testified that he drove behind the Defendant prior to the commencement of the video recording. However, it is unclear from the record whether Deputy McCullough observed the Defendant leave his lane of travel prior to the start of the video. Thus, the Court's probable cause finding is based upon the period of time that the in-car video was recording the Defendant's driving.

<u>States v. Randal</u>, 62 F. App'x 96, 98 (6th Cir. 2009), our appellate court found probable cause to effectuate a traffic stop after the officer observed the defendant riding on the center line three separate times for no apparent reason within a two mile stretch.  The Defendant, here, points out, and Deputy McCullough agreed in his testimony, that the road was dark and curved at times.  Given these conditions, the Defendant maintains that he was driving within his lane as nearly as practicable.  However, the propriety of the stop must be examined under the totality of the circumstances; therefore, the existence of certain driving conditions in and of themselves does not dictate whether a vehicle was driven as nearly as practicable within a single lane.  Although <u>Binette</u> recognized that traveling on a winding road was more difficult than navigating a straight path, the court's observation was made in conjunction with the fact that the in-car video showed that the defendant did not violate any rules of the road and only *touched* the center line twice.  In contrast, the Defendant here *crossed* the center line several times during a short span of time and Deputy McCullough's testimony has been found credible.  Based upon the foregoing, the Court finds that this is not a case where the crossing of the center line was an isolated incident.  Nor did the fact that the road curved at times, without more, make it impractical to stay within a single lane of travel.

Accordingly, the Court finds that Deputy McCullough had probable cause to believe that the Defendant had committed a traffic violation, and therefore, the ensuing traffic stop was proper.  Finding that the traffic stop was supported by probable cause, the Court must now determine whether the scope of the initial traffic stop was exceeded.

24

## B.    Propriety of the Detention

"A traffic stop is analogous to a 'Terry Stop' in that, following the initial stop, the subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation."  United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984)); see also Illinois v. Caballes, 543 U.S. 405, 407 (2005) (holding "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution").  "[O]nce the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."  United States v. Torres–Ramos, 536 F.3d 542, 550 (6th Cir. 2008) (citations and internal quotations omitted).  In other words, if a police officer develops reasonable suspicion that criminal activity is afoot during the completion of the traffic stop, the officer may extend the stop beyond its original purpose.  Id.

Accordingly, the Court's analysis is two-fold:  First, the Court must determine the initial scope of the traffic stop and the point at which that scope was exceeded, and second, the Court must assess whether Deputy McCullough had reasonable suspicion to lawfully extend the stop at the time the Defendant's detention began.  See id.

The Defendant maintains that by 2:55 a.m., Deputy McCullough had received information that the Defendant's driver's license was good and no outstanding warrants existed.  The Defendant asserts that this point in the traffic stop, Deputy McCullough should have been nearing the completion of the traffic citation and sending the Defendant on his way.  The Defendant further submits that because Deputy McCullough lacked reasonable suspicion to

25

continue detaining him from this point until the drug detection dog arrived, the scope of the stop was impermissibly exceeded. The Government contends that the Defendant's refusal to stop moving prolonged the stop and that by the time Deputy McCullough finished writing the citation around 3:10 a.m., he had developed reasonable suspicion to continue detaining the Defendant an additional nine minutes until the dog arrived.

### 1. Initial Scope of the Traffic Stop

"In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop." United States v. Bonilla, 357 F. App'x 693, 696 (6th Cir. 2009) (citing United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009)). The Court finds that the original purpose of the traffic stop was to write the Defendant a traffic citation for failure to drive within his lane when the Defendant crossed over the center line. Thus, in order to remain within the scope of the stop, Deputy McCullough's actions must be reasonably related to the purpose of writing the traffic citation. See id.

The Sixth Circuit has held that detaining a driver while writing a citation and making radio checks are "well within the bounds of the initial stop." Wellman, 185 F.3d at 656. Moreover, the Supreme Court has articulated that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration." Arizona v. Johnson, 555 U.S. 323, 325 (2009). In this regard, an officer may ask

> [q]uestions that hold potential for detecting crime, yet create little or no inconvenience. . . . [Such questions] do not signal or facilitate oppressive police tactics that may burden the public-for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any

> privacy interest or extract information without the suspects'
> consent.

United States v. Burton, 334 F.3d 514, 518 (6th Cir. 2003) (quoting with approval United States

v. Childs, 277 F.3d 947, 954 (7th Cir. 2002) (en banc), cert. denied, 537 U.S. 829

(2002)). Additionally, questions directed toward officer safety, such as inquiring about

dangerous weapons, do not unconstitutionally extend the stop. United States v. Everett, 601 F.3d

484, 494-95 (6th Cir. 2010). Nor does asking for consent to search a vehicle make a traffic stop

any more intrusive or coercive than a typical traffic stop. Burton, 334 F.3d at 518-19.

Ultimately, because reasonableness serves as the touchstone of the Fourth Amendment, an

officer's actions and questions during a traffic stop must be considered under the totality of the

circumstances. Everett, 601 F.3d at 494.

Of particular relevance to the Court's analysis is the number of times Deputy

McCullough left his cruiser, thereby redirecting the time that he would have otherwise spent on

completing the traffic citation, to question the Defendant. United States v. Stepp, 680 F.3d 651,

662 (6th Cir. 2012) ("We evaluate the reasonableness of the prolonging of a stop by considering

the totality of the circumstances, which requires considering both the duration of the extraneous

questioning and its subject matter."). The Court observes that on three separate occasions during

the course of the traffic stop, Deputy McCullough approached the Defendant's vehicle to ask

him questions unrelated to the initial purpose of the stop. The Court will examine each instance

individually to determine whether the scope of the stop was exceeded as a result.

The first line of extraneous questions occurred at 2:52:52. Deputy McCullough testified

that while he was writing the citation and checking for outstanding warrants, he observed the

Defendant staring back at him in the driver's side mirror as if the Defendant was trying to see

where Deputy McCullough was and what he was doing. Deputy McCullough believed that the Defendant's behavior was unusual in comparison to other drivers who looked every now and then to see what the officer is doing. Additionally, Deputy McCullough testified that he observed the Defendant moving in his vehicle and described the movements as leaning forward and reaching toward the backseat. Because of this behavior, Deputy McCullough got out of his cruiser and proceeded to question the Defendant about why he kept moving around.

The Court finds this line of questioning did not "measurably extend the stop's duration" as the questioning lasted just over a minute. [Ex. 1 at 2:52:52 - 2:54:10]. Moreover, the subject matter of the questions was not excessively intrusive given the Defendant's perceived behavior. The Court also notes that the Defendant raises no challenges as to the nature of this encounter. Thus, the Court finds that Deputy McCullough's initial inquiry into the Defendant's behavior was reasonable in length and subject matter under the circumstances.

The second line of extraneous questions occurred at 2:55:31. It is uncontested that at this point in the stop, the Defendant had just recently been cleared of outstanding warrants and all the information needed to write a traffic citation was within Deputy McCullough's possession. Thus, from this point forward, the Defendant maintains that Deputy McCullough essentially abandoned his investigation of the traffic violation and instead sought to uncover unrelated criminal conduct by asking questions related to narcotics. Deputy McCullough testified that because the Defendant was acting nervously, continued to move around, and was traveling from Knoxville during the early morning hours, he decided that further investigation was warranted. The Defendant was subsequently asked whether there were any narcotics in his vehicle, whether he would consent to his vehicle being searched, and whether a drug detection

dog would alert on the vehicle. The questioning lasted around four-and-one-half minutes. [Id. at 2:55:31-3:00:02]. Deputy McCullough thereafter returned to his cruiser, but the Defendant called him back twice to ask several questions, prolonging the stop an additional two minutes. [Id. at 3:00:16-3:02:17].

The Court agrees with the Defendant that, generally, when an officer has the pertinent information needed to write a traffic citation, the scope of the stop is exceeded if the vehicle and its occupants are not permitted to leave shortly thereafter. See United States v. Blair, 524 F.3d 740, 752 (6th Cir. 2008) (holding that "the purpose of the initial stop ended when the officer had collected sufficient information to issue the citation for the initial traffic stop"). However, in this case, the Court finds that the Defendant's behavior interrupted Deputy McCullough from completing the traffic citation. Specifically, on cross-examination, Deputy McCullough testified that his questions were based upon his concern that the Defendant might have been moving around in order to conceal narcotics or a weapon. Although this encounter lasted over four minutes, the Court finds that Deputy McCullough acted diligently in attempting to verify his suspicion. See Sharpe, 470 U.S. at 685-86 (holding that there is no "rigid time limitation on Terry stops" and that as long as the police are pursuing a diligent course of investigation "to confirm or dispel their suspicions quickly," courts "should not indulge in unrealistic second-guessing"). Moreover, two of those minutes are attributable to the Defendant debating whether or not he wanted to give consent. [Ex. 1 at 2:58:01-3:00:02]. Additionally, the Defendant ignores the fact that as soon as he refused consent, Deputy McCullough immediately returned to his cruiser, only to be called back twice because the Defendant had questions. Given Deputy McCullough's concerns about the Defendant moving around and the fact that the Defendant had

already been asked once to stop, the Court finds that Deputy McCullough acted within the bounds of his authority by making further inquiry into the situation and, therefore, he did not exceed to scope of the stop. See Burton, 334 F.3d at 518-519.

For these same reasons, the Court finds that the third time Deputy McCullough returned to the Defendant's vehicle, at 3:03:58, when the Defendant was asked to get out of his vehicle and was subjected to a pat-down for weapons, likewise did not exceed the scope of the initial stop. Deputy McCullough testified that after he returned to his cruiser following his second line of questioning, he continued to observe the Defendant move around. Deputy McCullough explained during the hearing that at this point in the stop, he was concerned for his safety. Thus, removing the Defendant from his vehicle and conducting a pat-down did not unreasonably extend the scope of the stop under these particular circumstances.

Based upon the foregoing timeline, the Court finds that the Defendant's continued failure to stop moving interrupted Deputy McCullough's completion of the traffic citation multiple times, and prevented the officer from completing the traffic citation any sooner than 3:10 a.m., the time listed on the traffic citation. The Defendant contends in his post-hearing brief that he could not have been moving because his head could be seen above the headrest and his hand was outside the window for most of the stop because he was smoking. However, Deputy McCullough testified that the Defendant was moving while his head remained visible above the headrest and that even when the Defendant had one hand on the window sill, he could still be observed moving. [Doc. 19 at 93, 99]. Therefore, the Court finds that Deputy McCullough's testimony has not been discredited in this regard. Given the number of times Deputy McCullough had to get out of his cruiser to ask the Defendant to stop moving, the Court finds

that Deputy McCullough did not lack diligence in completing the purpose of the traffic stop.  Accordingly, the length of the detention up until the completion of the traffic citation was within the scope of the initial traffic stop.

### 2. *Reasonable Suspicion of Criminal Activity*

The Court must now determine whether reasonable suspicion existed to continue detaining the Defendant until the drug detection dog arrived, which was approximately nine minutes after the traffic citation was completed.  In other words, "unless an independent reasonable suspicion of criminal activity arose . . ., continuing to hold [the Defendant] past [this] point amounted to a Fourth Amendment violation."  Stepp, 680 F.3d at 664.

Terry sets forth a two-prong test for determining the reasonableness of an investigatory stop.  United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006).  The first prong looks at "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion."  Id. (quoting United States v. Davis, 430 F.3d 354, 354 (6th Cir. 2005)).  If this prong is met, the second prong looks at "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  Id.  "Reasonable suspicion is more than an ill-defined hunch; 'it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity.'"  United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  "The government bears the burden of proving, by a preponderance of the evidence, the existence of

31

reasonable suspicion to believe—based upon objective and articulable facts—that the defendant[] [was] engaged in criminal activity." Torres-Ramos, 536 F.3d at 552. In determining whether the totality of the circumstances supports a finding that reasonable suspicion existed, "courts must consider all of the officers observations, and not discard those that may seem insignificant or troubling when viewed standing alone." United States v. Martin, 289 F.3d 392, 398 (6th Cir. 2002) (citing United States v. Arvizu, 534 U.S. 266, 273(2002)).

The Government relies upon the following as specific and articulable facts justifying further detention of the Defendant until Officer Porter arrived with Bolo: 1) the Defendant seemed nervous because he continued to stare intently at Deputy McCullough throughout the entire stop; 2) the Defendant moved around in his vehicle, including leaning forward and reaching backwards, after Deputy McCullough repeatedly asked him not to move; 3) the location of the stop was in a "high-crime area;" 4) the Defendant was travelling from Knoxville; and 5) the time of the stop was during the early morning hours.[4]

The Defendant argues that none of these factors individually or in combination provide reasonable suspicion that the Defendant was involved in criminal activity. In his post-hearing brief, the Defendant maintains that the in-car video revealed no indication that the Defendant was unusually nervous as he was not "stammering, perspiring unduly, or evasive in his answer." [Doc. 20 at 28]. Moreover, the Defendant asserts that he was naturally concerned about what

---

[4] As an additional factor to the reasonable suspicion analysis, the Government argues that Deputy McCullough had reason to believe that the Defendant was violent. [Doc. 22 at 10]. The Government points to the following in support: (1) the Defendant had been convicted of domestic violence; (2) the Defendant told Deputy McCullough he did not like the police, which Deputy McCullough characterized as a response usually given by "career criminals;" and (3) the Defendant responded he was afraid of being shot when Deputy McCullough asked him why he seemed so nervous, even though no weapons or other aggressive behavior was displayed by Deputy McCullough. [Id.]. Deputy McCullough's testimony, however, is void of any indication that he believed that he was dealing with a violent individual. Thus, because the record does not support a finding that this factor was relied upon by Deputy McCullough in suspecting that criminal activity was afoot, the Court will not consider this factor in its analysis. See United States v.Townsend, 305 F.3d 537, 544 (6th Cir. 2002) ("The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely.").

was going on and thus, looking back at Deputy McCullough "is so innocuous as to be meaningless." [Id. at 31]. The Defendant also refutes the significance of coming from Knoxville late at night. He asserts that any city could unfairly be characterized as a "known drug source" and therefore this factor does not weigh in favor of reasonable suspicion. Finally, the Defendant challenges the characterization that Rockford is a "high-crime area," arguing that nothing in the record supports the contention.

In the present matter, the Court places little weight on the allegation that the Defendant was acting unusually nervous by continually staring at Deputy McCullough throughout the stop. The Sixth Circuit has repeatedly expressed caution in considering nervousness as a reliable factor in the reasonable suspicion framework. See United States v. Urrieta, 520 F.3d 569, 577 (6th Cir. 2008) (observing that "this court has found nervousness inherently unsuspicious, and has therefore given it very limited or no weight in the reasonable-suspicion calculation"); Richardson, 385 F.3d at 630 (noting that "nervousness is an unreliable indicator, especially in the context of a traffic stop"). Our appellate court further elaborated on "nervous indicators" in United States v. Johnson, explaining that "eye contact, apprehensiveness while handing over a license, sweating, forgetting to provide paperwork, standing, and looking back and forth between two officers" are weak indicators because they are commonplace behaviors in the traffic-stop context. 482 F. App'x 137, 145 (6th Cir. 2012). However, under the totality of the circumstances, nervousness should not be completely ruled out if accompanied by "additional evidence of wrongdoing." United States v. Andrews, 600 F.2d 563, 566 (6th Cir. 1979). In the instant case, however, the Court cannot say that the Defendant's "intense stare" was anything more than curiosity as to what was going to happen next during the stop.

More significant to the reasonable suspicion analysis, however, is Deputy McCullough's observation that the Defendant continued to move around in his vehicle. See United States v. Graham, 483 F.3d 431, 439 (6th Cir. 2007) (finding the officer's observation of the defendant "dip[ping] with his right shoulder toward the floor as if he was placing something under his seat" contributed to the reasonable suspicion calculation because the defendant's action was the type of furtive movement consistent with hiding a firearm); Caruthers, 458 F.3d at 466 (determining that "[f]urtive movements made in response to a police presence may also properly contribute to an officer's suspicions"). Deputy McCullough testified that he observed the Defendant lean forward and reach toward the backseat and that the Defendant continued to move around after being asked to stop on at least two occasions prior to asking the Defendant to get out of his vehicle. Because the Defendant ignored the repeated instructions to sit still, Deputy McCullough was justified in his concern that the Defendant's movements could be explained as an attempt to reach for or conceal a weapon or narcotics. Moreover, the Defendant's concession that his vehicle had been searched in the past after he had been around "weed smoke" further lends support to the suspicion that drugs were in the vehicle. Therefore, this factor suggests that criminal activity was afoot.

Addressing the "contextual considerations," i.e., the location of the stop, the late hour of the stop, and the fact that the Defendant was returning home from a "source city," the Sixth Circuit has warned against over generalizing these factors. Caruthers, 458 F.3d at 467. In particular, the Sixth Circuit has cautioned against labeling an area as "high-crime:"

> The citing of an area as "high-crime" requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. District courts must carefully examine the testimony of police officers in cases such as this, and make a fair and forthright

34

> evaluation of the evidence they offer, regardless of the consequences.

Id. at 467-68 (quoting with approval United States v. Montero–Camargo, 208 F.3d 1122, 1138 (9th Cir. 2006) (en banc), cert. denied, 531 U.S. 889 (2000)).  As a result, the high-crime factor should be limited to:  "specific intersections rather than an entire neighborhood," specific "crimes that frequently occur in the area," and crimes that are "related to the reason for which [the defendant] was stopped."  Id. at 468.

Here, the Court is troubled by the Government's generalization that Rockford is a "high-crime area."  Deputy McCullough testified that Rockford is an area that experienced a lot of apartment thefts and drug crimes although he could not recall responding to a call at the location of the stop prior to his encounter with the Defendant.  The Court finds the characterization of Rockford too generic to support a specific and articulable claim that the Defendant was pulled over in an area known for criminal activity.  Moreover, even if the Court were to accept the Government's contention, the suspicion is easily alleviated by the fact that the Defendant lived down the road from where he was stopped, which would therefore explain his presence in a "high-crime area."  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (observing that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime") (citation omitted).

In regards to the time of the traffic stop, the Sixth Circuit has attributed the late hour of a stop as part of the reasonable suspicion calculation.  See Blair, 524 F.3d at 751 (noting that "[a] late hour can contribute to reasonable suspicion," but describing 10:30 p.m. as "an hour not late enough to arouse suspicion of criminal activity"); Caruthers, 458 F.3d at 467 (finding 1:20 a.m.

35

to be a factor in its reasonable suspicion analysis). In the present matter, the Court observes that being stopped at 2:45 a.m., in and of itself does support a finding of reasonable suspicion. However, this factor must be taken into consideration under the totality of the circumstances. The Court considers this factor in conjunction with Deputy McCullough's testimony that he makes most of his narcotic stops at nighttime and his concern that the Defendant's movements were consistent with attempting to conceal narcotics or a weapon. Thus, the Court finds this factor lends support to the reasonable suspicion calculation.

Finally, the Government argues that reasonable suspicion existed because the Defendant was traveling from Knoxville. Specifically, the Government submits that "Deputy McCullough knows that most drugs dealers in [the Rockford] area get their drugs from Knoxville, where larger quantities of drugs are more readily available." [Doc. 15 at 12]. The Court finds no merit in the Government's argument. See Andrews, 600 F.2d at 566 (noting that "our experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center"). In United States v. Townsend, the court refused to attach suspicion to the officers' claims that the defendants were traveling between two "source cities," Chicago and Columbus. 305 F.3d 537, 544 (6th Cir. 2002). The court found that traveling between "two large, mutually proximate Midwestern cities, is a more common occurrence." Id. Likewise, here, the Court finds nothing inherently suspicious, when viewed singularly or in combination with the surrounding circumstances, about driving from Knoxville to one of its outlying cities, such as Rockford, which is a common occurrence.

36

When viewing these factors in their totality using a common-sense approach, the Court finds that Deputy McCullough formed a reasonable suspicion. Based upon the Defendant's furtive movements after repeated requests that the Defendant stop moving, combined with the late hour of the stop, Deputy McCullough had reason to believe that the Defendant's actions were an attempt to conceal narcotics or a weapon in his vehicle. See United States v. Cortez, 449 U.S. 411, 419 (1981) (holding that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion").

The Court must now consider Terry's second prong, i.e., whether "the 'degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand.'" Hoover v. Walsh, 682 F.3d 481, 497-98 (6th Cir. 2012) (quoting O'Malley v. City of Flint, 652 F.3d 662, 670 (6th Cir. 2011). In this respect, it is appropriate to examine whether the detention was sufficiently limited in time and the investigative means used were the least intrusive means reasonably available. Davis, 430 F.3d at 354 (quoting Bennett v. City of Eastpointe, 410 F.3d 810, 825-26 (6th Cir. 2005)).

The Court finds that from the inception of the stop, which occurred at 2:45 a.m., up until Officer Porter arrived with K-9 Bolo, approximately thirty-four minutes later at 3:19 a.m., there was no "delay unnecessary to the legitimate investigation of the law enforcement officers." Sharpe, 470 U.S. at 687. After the Defendant declined consent to search his vehicle, Deputy McCullough called dispatch to request K-9 assistance. At this point, Deputy McCullough had not finished writing the traffic citation. By the time the traffic citation was completed at 3:10

a.m., which the Court has found did not exceed the scope of the stop, Deputy McCullough had developed reasonable suspicion to continue detaining the Defendant past the purpose of the initial stop.  Seizing the Defendant for an additional nine minutes until Officer Porter arrived with Bolo was sufficiently limited in time.  See Davis, 430 F.3d at 354 (finding that detaining the defendant for an additional thirty to forty-five minutes for a drug detection dog to arrive after the officer had developed reasonable suspicion was permissible).  Moreover, the dog sniff lasted less than two minutes.  [Ex. 1 at 3:23:04-3:34:44].  Based upon the foregoing, the Court finds that the officers acted diligently and the time the Defendant had to wait was well within the dictates of the Fourth Amendment.  See Sharpe, 470 U.S. at 685-86.

The Court also concludes that the use of Bolo to conduct a dog sniff around the Defendant's vehicle was the least intrusive means the officers could use to verify or dispel Deputy McCullough's suspicion that the Defendant was concealing narcotics in his vehicle.  See Caballes, 543 U.S. at 409 (holding that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests"); Davis, 430 F.3d at 355 (finding a dog sniff of the defendant's vehicle during a lawful traffic stop was minimally intrusive).

Accordingly, the Court finds the Defendant's furtive movements during a late-hour traffic stop after the Defendant failed to comply with Deputy McCullough's multiple requests to stop moving provided reasonable suspicion to extend the traffic stop beyond the duration and scope permissible based upon the initial purpose of the stop.

38

## C. Propriety of the Frisk

Finally, the Defendant argues that he was illegally subject to a <u>Terry</u> frisk as he waited for the drug detection dog to arrive. "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 n.6 (1977) (per curiam); <u>see</u> <u>United States v. Ware</u>, 465 F. App'x 487, 494 (6th Cir. 2012) (explaining that "the legitimate and weighty interest in police officer safety outweighs the *de minimis* additional intrusion of requiring a driver who is already lawfully stopped to get out of the car") (citing <u>Mimms</u>, 434 U.S. at 110-11). Moreover, if a reasonable person would conclude that the driver "might be armed and presently dangerous" based upon the circumstances known at the time, the driver may be frisked for weapons. <u>Mimms</u>, 434 U.S. at 111-12; <u>Johnson</u>, 555 U.S. at 327. "The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he 'had an indication' that the defendant was in fact armed." <u>United States v. Bell</u>, 762 F.2d 495, 500 n.7 (6th Cir. 1985). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972).

The Defendant argues that Deputy McCullough lacked specific, articulable facts creating a reasonable inference that the Defendant was armed and dangerous. The Defendant's argument centers around the contention that nothing significant happened during the course of the traffic stop that would justify a pat-down of the Defendant's person.

39

In regards to furtive movements and a failure to comply with an officer's order, our appellate court has recently addressed the role these factors can play in the context of a traffic stop. In United States v. Tillman, No. 12-6436, 2013 WL 6038230, at *5 (6th Cir. Nov. 14, 2013), the officer observed the defendant quickly reaching over to the passenger side of the vehicle twice. While the defendant claimed reaching across the seat was insignificant, the court stated that the argument failed to appreciate "that innocent conduct, examined in its totality, can support a finding of reasonable suspicion." Id. (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)). Moreover, the defendant's movements were inconsistent with a driver reaching for his driver's license and registration as the defendant had neither in his hands when the officer subsequently approached. Id. The court also considered the defendant's failure to keep his hands on the steering wheel, in plain view, after being instructed to do so twice. Id. at *4. The officer testified that the defendant's noncompliance made the officer uncomfortable and fearful that the defendant had a weapon. Id. The court explained that "[o]n balance, our cases suggest that when a suspect's movements cannot be observed by the officer and the suspect does not listen to orders, the risk of danger rises, making a decision to frisk reasonable under the circumstances." Id.

In the instant case, the Court finds that at the time Deputy McCullough asked the Defendant to get out of his vehicle and patted him down for weapons, Deputy McCullough had a reasonable belief that the Defendant may have been armed and dangerous, such that it was permissible to conduct a limited search for weapons for officer safety. See Terry, 392 U.S. at 26. Like Tillman, the Defendant's movements were inconsistent with grabbing his driver's license, registration, and insurance as he had already handed them over at the time he was observed

leaning forward and reaching into the backseat. Also like in <u>Tillman</u>, Deputy McCullough testified that because the Defendant continued to move around after being instructed several times to stop, he became increasingly nervous and uncomfortable that the Defendant was reaching for or concealing a weapon. Accordingly, "[Deputy McCullough's] concern for his safety was not only objective and particularized, but also warranted under the circumstances." <u>Tillman</u>, 2013 WL 6038230, at *4.

The Defendant further asserts that Deputy McCullough testified that he had no reason to believe the Defendant was armed at the time he was removed from his vehicle and patted down. This argument is not supported by the record. Deputy McCullough testified that during the second time he approached the Defendant's vehicle to inquire into the Defendant's behavior and subsequently ask for consent to search [Ex. 1 at 2:55:35-3:00:02], he did not believe the Defendant was armed. [Doc. 19 at 90]. In regards to the third time Deputy McCullough returned to the Defendant's vehicle in which he asked the Defendant to get out of his vehicle and patted him down, Deputy McCullough testified that it was at this point in the stop that he became concerned that the Defendant was armed. [<u>Id.</u> at 101]. Deputy McCullough explained,

> I was concerned that he either -- he was up to something, that he had either drugs or a weapon that he was trying to conceal within the vehicle. I patted him down for that reason, for safety, to make sure that he wasn't standing there with a gun or some type of weapon on his person.

[<u>Id.</u>]. Moreover, because it was late at night when the movements of a vehicle's occupants are even less visible combined with the fact that Deputy McCullough was the sole officer on the scene, the Court finds that patting the Defendant down was a legitimate safety concern under the circumstances.

41

The Court also finds that Deputy McCullough did not exceed the scope of the pat-down by emptying the Defendant's pockets. After removing the Defendant from his vehicle, Deputy McCullough told the Defendant that he was going to pat him down for weapons. Prior the pat-down, Deputy McCullough asked for consent to empty the Defendant's pockets. [Ex. 1 at 3:04:19]. The Defendant replied, "Go ahead, sir." [Id. at 3:04:21]. The Defendant argues that he did not give consent and that consent must be "unequivocal and intelligently given, untainted by duress or coercion." [Doc. 20 at 40 (quoting United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990))]. The Defendant fails to explain, however, how his consent was tainted or gained through coercion. To the extent that the Defendant argues that his consent was involuntary because Deputy McCullough already had his hands placed on him, the argument is not well-taken. Deputy McCullough testified, and the in-car video verifies, that the Defendant placed his hands on his head and then Deputy McCullough placed one of his hands on top of the Defendant's and used his other hand to tug on the Defendant's shirt to get him to step back. This all took place prior to the pat-down and before emptying the Defendant's pockets. Under the circumstances, the Court finds nothing coercive or illegal in Deputy McCullough's request to empty the Defendant's pockets. See United States v. Stennis, 457 F. App'x 494, 502 (6th Cir. 2012) (holding that "any pulling up of [the defendant's] shirt or jacket was a *de minimus* action attributable to patting down [the defendant's] waist while he was in a seated position."); United States v. Reyes, 349 F.3d 219, 225 (5th Cir. 2003) (holding that in light of the officer's reasonable suspicion that the defendant might be armed, the officer's request that the defendant empty his pockets and their shirts was permissible under Terry); see also United States v. Hill, 545 F.2d 1191, 1193 (9th Cir. 1976) (holding that "Terry does not in terms limit a weapons

search to a so-called 'pat down' search.  Any limited intrusion designed to discover guns, knives, clubs or other instruments of assault are permissible").

Finally, the Court finds that based on the reasonable belief that the Defendant may have been armed, it was also permissible for Deputy McCullough to secure the Defendant in handcuffs following the pat-down.  Houston v. Clark County Sheriff Deputy John Does 1–5, 174 F.3d 809, 815 (6th Cir. 1999) (holding that "the use of handcuffs [does not] exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution"); United States v. Monhollen, 145 F.3d 1334 (6th Cir. 1998) (finding that Terry permitted placing the defendant in handcuffs while the area was being secured).  The fact that a weapon was not discovered on the Defendant's person following the pat-down did not alleviate Deputy McCullough's concern for his safety.  In United States v. Graham, the Sixth Circuit found that although no weapons were discovered during the lawful pat-down of the defendant, the pat-down had not extinguished the officers' suspicion that the Defendant was armed and dangerous, and, therefore, placing the defendant in handcuffs and seating him in the back of the police cruiser until a search of the defendant's vehicle could be conducted did not exceed the bounds of Terry.  483 F.3d 431, 440-41 (6th Cir. 2007).  The court explained that because the defendant had only been detained and not arrested at the time he was patted down for weapons, if the officers did not search the vehicle and instead allowed the defendant to go, the defendant would have had immediate access to a weapon once he reentered his vehicle. Id.; see Michigan v. Long, 463 U.S. 1032, 1052 (1983) (holding that "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside").

While the reasonableness of handcuffing a vehicle's occupant's during a traffic stop turns upon the particular facts of each case, the Court finds that after a holster was retrieved from the Defendant's pocket, Deputy McCullough was justified in handcuffing the Defendant who had only been detained at this point. In light of Deputy McCullough's testimony that the holster was of the kind that is used for carrying a gun, the Defendant's furtive movements, and the fact that Deputy McCullough was the only officer on the scene at the time the holster was retrieved, the Court finds that handcuffing the Defendant out of precaution was justified under the circumstances and therefore did not exceed the bounds of Terry.

## IV. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence obtained from the search of the Defendant's person or vehicle. For the reasons set forth herein, it is **RECOMMENDED**[5] that the Defendant's Motion to Suppress [**Doc. 13**] be **DENIED**.

Respectfully submitted,

        s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).